No. 04-780

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 333

DONALD S. EKLUND,

        Plaintiff and Appellant,

   v.

ROY TROST, LYNNE HAMILTON, Custodian for Roy Trost;
CARL MOODY; WHEATLAND COUNTY and its Sheriff,
STEVE RIVELAND; and YELLOWSTONE COUNTY; its
subordinate YELLOWSTONE COUNTY YOUTH SERVICE
CENTER; DONNA MARMON, Juvenile Probation Officer, and
her employers, GOLDEN VALLEY COUNTY, MEAGHER
COUNTY, MUSSELSHELL COUNTY, and WHEATLAND COUNTY,

        Defendants, Respondents, and Cross-Appellants.

APPEAL FROM:    The District Court of the Fourteenth Judicial District,
                In and For the County of Wheatland, Cause DV-2001-13,
                Honorable Katherine M. Irigoin, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Thomas E. Towe, Towe, Ball, Enright, Mackey & Sommerfeld,
                P.L.L.P., Billings, Montana

        For Respondents:

                Dennis Paxinos, County Attorney; Kevin Gillen, Deputy County Attorney,
                Billings, Montana (Yellowstone County and Yellowstone County
                Youth Services Center)

                Steven R. Milch, Crowley Law Firm, Billings, Montana (Golden
                Valley, Wheatland, Meagher, and Musselshell Counties and Marmon)

                Norman H. Grosfield and Dee Ann G. Cooney, Utick & Grosfield,
                Helena, Montana (Wheatland County and Riveland)

                             Submitted on Briefs:  March 29, 2006
                                   Decided:   December 14, 2006

Filed:

                                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Donald S. Eklund sustained injuries after a vehicle driven by Respondent Roy Trost lost control and struck him. Eklund brought suit against Trost, Trost's mother Lynne Hamilton, Wheatland County Sheriff Steve Riveland, the Yellowstone County Youth Services Center, Trost's juvenile probation officer Donna Marmon, and Golden Valley, Meagher, Wheatland, and Musselshell Counties. The District Court granted summary judgment to Respondents Donna Marmon, Sheriff Steve Riveland, and Wheatland County. The District Court denied Yellowstone County's motion for summary judgment, and presided over a jury trial regarding Yellowstone County's purported negligence on October 4, 2004. The jury found that Yellowstone County did not breach a duty owed to Eklund. Eklund appeals from the orders granting summary judgment, as well as from evidentiary orders surrounding the jury trial. We affirm in part, reverse in part, and remand to the District Court for further proceedings consistent with this opinion.

¶2 We consider the following issues on appeal:

¶3 (1) Did the District Court err in granting summary judgment to Donna Marmon and Golden Valley, Wheatland, Meagher, and Musselshell Counties on the basis of quasi-judicial immunity?

¶4 (2) Did the District Court err in granting summary judgment to Sheriff Steve Riveland and Wheatland County on the basis that neither owed a duty to Eklund?

¶5 (3) Did the District Court abuse it discretion in bifurcating the jury trial in response to Eklund's request to introduce evidence of his settlement with Roy Trost?

**FACTUAL BACKGROUND**

¶6 "Ungovernable," kicked out of school, and consistently in trouble, Respondent Roy Trost (Trost) arrived at the Yellowstone County Youth Services Center (YSC) in Billings on

2

December 2, 2000. In the two weeks after arriving, Trost ran away on two occasions. The first time, the day after he arrived, Trost returned to YSC on his own accord. On the second occasion, however, law enforcement apprehended Trost in Melstone, Montana. Subsequently, and at the request of his juvenile probation officer, Donna Marmon (Marmon), Trost was placed in YSC's secure detention facility. Though YSC released Trost to his mother six days later, Trost was placed on probation as a result of his run-away episodes.

¶7 Trost violated his probation in May of 2001. As a result, the Fourteenth Judicial District Court ordered him detained in YSC's secure detention unit until "further order of the District Youth Court or until released by the Youth Probation Officer." Thereafter, at a June 5, 2001, hearing in the Youth Court, Judge Spaulding discussed the possibility of transferring Trost to YSC's unsecured shelter care wing. Judge Spaulding, however, ultimately placed the decision to transfer Trost in the discretion of Marmon.

¶8 After the June 5, 2001, hearing, and because she questioned the propriety of "continually keeping Trost in secure detention," Marmon considered the possibility of transferring Trost to the unsecured wing of YSC. The Meagher County Attorney, Trost's attorney, YSC staff, as well as Trost and his mother were all given the opportunity to voice their opinions on the issue. Generally, each supported such a transfer. Further, it appeared that Trost's behavior was improving.

¶9 As a result of his positive evaluations, YSC and Marmon transferred Trost to the unsecured shelter care side of YSC on June 7, 2001. As part of that transfer, Marmon prepared a YSC face sheet containing Trost's important information. Among other things, Marmon listed her work phone number, Trost's address, and Trost's mother's phone number on the face sheet. In addition, Marmon listed a phone number for the Meagher County Sheriff's Department in

3

case of a runaway or emergency. Marmon listed the Meagher County Sheriff's Department because it was the county of residence for both Trost and his mother, and further, because Meagher had been the county which had arrested Trost for the probation violation which had resulted in his then-current placement at YSC.

¶10    Trost and his seventeen-year-old YSC cohort, Dustin Drennan, ran from YSC in the late evening of June 10, 2001. Immediately thereafter, YSC notified the Billings Police Department and the Meagher County Sheriff's Department that the two youths were on the run. Further, YSC left phone messages with Trost's mother and with Marmon's probation office in Roundup, Montana, regarding the runaway.

¶11    Trost and Drennan hitchhiked from Billings to Roundup, in Musselshell County, in the late night of June 10, 2001. Early the next morning, they were noticed by a Musselshell County deputy sheriff, who thought their presence unusual but did not stop them, believing he did not have a legal basis to do so. The Musselshell County Sheriff had not received notification of the youths' escape. After wandering the streets of Roundup, Trost and Drennan came upon Trost's grandfather's unlocked pickup truck parked outside the Pioneer Café—with the keys in the ignition. Trost drove off in the truck, with Drennan as his passenger.

¶12    Approximately one hour after the theft, Trost's grandfather reported his truck stolen. Upon learning that Trost had escaped from YSC, he offered to the authorities his belief that his grandson had been the culprit. Thereafter, at 9:59 a.m., the Musselshell County dispatcher alerted Wheatland County dispatcher Hope Pallas of the stolen truck, and Pallas relayed this information to all units of the sheriff's department.

¶13    Wheatland County Undersheriff Les Christensen heard Pallas's report at 10:05 a.m., and radioed back to obtain more information. Specifically, Christensen sought a more complete

4

description of the truck. Later, Pallas radioed Christensen again to inform him that the maroon and silver pickup had been spotted by an informant in Ryegate and appeared to be heading west toward Harlowton. Christensen immediately proceeded in that direction. Highway Patrol Officer James Rosenberg was with Christensen at that time.

¶14 Christensen intercepted the stolen pickup three miles east of Harlowton on Highway 12. Both Christensen and Rosenberg confirmed that the truck, when it passed, was not traveling at a high rate of speed. Christensen began pursuit. Despite the police cruiser's flashing lights and sirens, however, the stolen pickup did not stop. Though they suspected Trost as the driver, neither Christensen nor Rosenberg was able to positively identify Trost or Drennan at the time.

¶15 According to the factual assertions offered in support of summary judgment, as Christensen pursued Trost toward Harlowton, the vehicles accelerated, racing at approximately 70 to 80 mph. The chase continued at high speed even after the cars entered Harlowton's city limits. Officer Greg Clements joined the pursuit less than a mile east of downtown Harlowton, and estimated that Trost's vehicle was traveling 60 to 80 mph at that time. Trooper Rosenberg, in the car with Christensen during the entirety of the chase, estimated that Christensen's speed as they entered town was approximately 75 to 80 mph. Christensen himself noted in his report that:

> I kept hoping that the suspects would stop, but it became apparent that they weren't. I started to slow down near the IGA grocery store. I realized that we were going way to [sic] fast in town and that someone was going to get hurt.

¶16 The Wheatland County Sheriff's Department has a police pursuits policy describing procedures for safe police pursuits. That policy reads in pertinent part:

> 1. IN TOWN
>
> Pursuit with emergency vehicle for traffic offense will consist of using lights and siren initially and at a *controllable and safe speed*. . . . If I.D. cannot be made and eluding vehicles continue in an unsafe manner, *call for backup unit for*

5

*misdemeanor road block and try to keep eluding vehicle in sight without endangerment.*

(Emphasis added.) Despite the police pursuits policy, Officer Christensen did not request a roadblock during the four-minute pursuit. He did, however, reduce his speed to approximately 50 mph sometime after he entered the city limits and neared the IGA grocery store.

¶17 As Trost raced through the downtown area, he lost control of the stolen pickup, clipped the front end of a car, and ultimately struck Eklund in a parking lot. Though Eklund attempted to avoid the collision, surrounding cars precluded escape, and the force of the accident threw him into the air. Eklund lost his spleen, suffered a collapsed lung, sustained numerous abrasions and lacerations and other injuries.

¶18 Alleging negligence, Eklund brought suit against the named defendants, and later settled with Trost and Trost's mother, Lynne Hamilton. After various motions for summary judgment, the District Court granted summary judgment to Donna Marmon and her employer counties as well as to Wheatland County and its Sheriff, Steve Riveland. The District Court denied Yellowstone County and YSC's motion for summary judgment. The court scheduled a jury trial on Yellowstone County's purported negligence for October of 2004. After pretrial arguments regarding the admissibility of evidence of the settlement between Trost and Eklund, the District Court ruled the evidence admissible, but bifurcated the trial into liability and damages phases. Thereafter, the jury found Yellowstone County not negligent on October 7, 2004.

¶19 Eklund appeals from the District Court's orders granting summary judgment and its decision to bifurcate the jury trial.

## STANDARDS OF REVIEW

¶20 The initial issue presented herein is a district court's granting of summary judgment to multiple defendants. We review such grants *de novo*, determining whether each grant of

6

summary judgment was correct. *Abraham v. Nelson*, 2002 MT 94, ¶ 9, 309 Mont. 366, ¶ 9, 46 P.3d 628, ¶ 9; *see also Steer, Inc. v. Department of Revenue*, 245 Mont. 470, 474-75, 803 P.2d 601, 603 (1990).

¶21    Summary judgment is only proper when no genuine issues of material fact exist such that the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c). "The initial burden is on the moving party to demonstrate 'a complete absence of any genuine issue as to all facts considered material in light of the substantive principles that entitle the moving party to judgment as a matter of law and all reasonable inferences are to be drawn in favor of the party opposing summary judgment.'" *Schmidt v. Washington Contractors Group*, 1998 MT 194, ¶ 7, 290 Mont. 276, ¶ 7, 964 P.2d 34, ¶ 7. "Once the moving party meets this burden, the burden shifts to the non-moving party to establish otherwise." *Schmidt*, ¶ 7.

## DISCUSSION

***Issue 1: Did the District Court err in granting summary judgment to Donna Marmon and Golden Valley, Wheatland, Meagher, and Musselshell Counties on the basis of quasi-judicial immunity?***

¶22    Governmental agencies and officers are immune from tort liability when they commit torts while performing quasi-judicial functions. *See Newville v. State, Dept. of Family Services*, 267 Mont. 237, 266, 883 P.2d 793, 810 (1994); *Trout v. Bennett*, 252 Mont. 416, 830 P.2d 81 (1992); *State v. District Court*, 246 Mont. 225, 805 P.2d 1272 (1990); *Koppen v. Board of Medical Examiners*, 233 Mont. 214, 759 P.2d 173 (1988); *see also* § 2-9-112, MCA (1999) (immunity from suit for judicial acts and omissions). A "quasi-judicial function" is defined as "an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies." Section 2-15-102(9), MCA (1999). Our cases have further defined quasi-judicial function by noting the difference between quasi-judicial

7

and ministerial or administrative functions for which immunity is not provided. *See Trout*, 252 Mont. at 426, 830 P.2d at 87; *State v. District Court,* 246 Mont. at 228-29, 805 P.2d at 1275.

¶23    In *State v. District Court,* we defined quasi-judicial functions as those that

> lie midway between the judicial and ministerial ones.  The lines separating them from such . . . are necessarily indistinct; but, in general terms, when the law, in words or by implication, commits to any officer the duty of looking into facts, and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial, the function is termed quasi-judicial . . . .

*State v. District Court,* 246 Mont. at 229, 805 P.2d at 1275 (quoting *State ex rel. Lee v. Montana Livestock Sanitary Board*, 135 Mont. 202, 206, 339 P.2d 487, 489-90 (1959)).  We have also addressed administrative or ministerial acts, defining them as acts performed in a legally prescribed manner, without regard to the exercise of the actor's discretion or judgment.  *State v. District Court,* 246 Mont. at 229, 805 P.2d at 1275.  The primary difference between quasi-judicial functions and ministerial or administrative functions is that quasi-judicial functions involve the exercise of the actor's discretion, whereas administrative or ministerial functions are performed without the exercise of discretion.

¶24    Eklund argues that Marmon negligently filled out Trost's YSC face sheet upon Trost's transfer from YSC's secure wing to its unsecured wing, failing to list sufficient information to facilitate law enforcement's effort to apprehend Trost.  Eklund notes that Marmon failed to include the phone number for the Musselshell County Sheriff's office and her own home phone number on the face sheet.  Eklund argues that completion of the face sheet constituted a ministerial act, and therefore, Marmon is not entitled to quasi-judicial immunity in performing that act negligently.  The crux of Eklund's argument is that, pursuant to § 41-5-1703(1)(c), MCA (2003), Marmon was required to list her home phone number and the phone number for the Musselshell County Sheriff's Department on Trost's YSC face sheet.  Because he claims that the

8

statute required those actions, the act of completing the face sheet was ministerial, and therefore Marmon is not entitled to immunity.

¶25     However, § 41-5-1703(1)(c), MCA, does not affirmatively require probation officers to list certain information on face sheets—in fact, the statute says nothing of face sheets and their completion.  Instead, it only generally requires juvenile probation officers to "supervise, assist, and counsel youth placed on probation . . . ."  We perceive Eklund's argument to be that (1) § 41-5-1703(1)(c)'s "supervise, assist, and counsel" language should be interpreted as requiring probation officers to list specific information on face sheets, and as applied here, required Marmon to list her home phone number as well as that of the Musselshell County Sheriff's Department on Trost's face sheet, and (2) that  interpreting the statute in this way necessarily requires the conclusion that the act of completing the face sheet is ministerial, not entitling Marmon to quasi-judicial immunity.

¶26     In *Koppen*, the plaintiffs alleged that the State Board of Medical Examiners was negligent in failing to revoke the license of a then-practicing physician who had been the subject of numerous complaints.  Plaintiffs specifically challenged the Board's failure as a violation of § 37-3-202, MCA, which generally requires the Board to ensure that all physicians licensed in Montana maintain standards of conduct in the greatest public interest.  *See Koppen*, 233 Mont. at 215-16, 759 P.2d at 174.  We held, however, that the Board's decision to initiate proceedings against a doctor was discretionary, and not *required* by the statute.  Therefore, we concluded that the Board's non-action was quasi-judicial and entitled it to immunity.

¶27     Similar to the plaintiffs' argument in *Koppen*, Eklund reads a statute which governs generally as giving rise to specific duties during a fact selective inquiry—here the one undertaken by Marmon when filling out the YSC face sheet.  However, no provision requires

9

probation officers to include any particular information on face sheets. Rather, face sheets are filled out in the discretion of the probation officer, who lists the information deemed to be important to the matter or individual at issue. Of course, what is "important" changes with each case, depending on the circumstances. As pointed out by Marmon, she generally includes on a face sheet for a runaway juvenile not only her office phone number, but "the sheriff's office in the county that [the runaway is] residing in—or the parents are residing in." Following this policy, Marmon listed her office phone number and that of the Meagher County Sheriff's Office as well, because Meagher County was the county of residence for Trost and his mother, Lynne Hamilton. Nothing required Marmon to list the contact numbers urged by Eklund.

¶28 Further, it is evident that the Youth Court considered the issue of transferring Trost to the unsecured wing at YSC and decided to delegate the making of this decision to Marmon. Pursuant to this assignment, Marmon solicited the advice of other parties and made a discretionary call, in her capacity as a probation officer for the Youth Court, to move Trost.[1] Writing up a face sheet was a necessary part of Trost's transfer and the manner in which it was completed was in Marmon's discretion, listing the agencies and contact numbers she felt appropriate under the circumstances, especially where no statute controlled.

¶29 Though Eklund offers other cases in which this Court has previously deemed acts to be administerial or ministerial in nature, those cases involved statutes or rules which required that the relevant act be completed in a specific manner, not allowing for the exercise of discretion. *See State v. District Court,* 246 Mont. at 234, 805 P.2d at 1278; *Newville*, 267 Mont. at 268-69, 883 P.2d at 811-12. As noted above, this case is different—no statute controls a juvenile

---

[1]*See* § 41-5-103(43), MCA (1999) ("youth court" means the court established pursuant to this chapter to hear all proceedings in which a youth is alleged to be a delinquent youth, a youth in need of intervention, or a youth in need of care and includes the youth court judge, probation officers, and assessment officers).

10

probation officer's completion of a face sheet in a way that is remotely similar to the statutes in *State v. District Court* and *Newville*.

¶30     For the above reasons, we conclude that Marmon's completion of Trost's YSC face sheet was a discretionary and quasi-judicial act.  For that reason, we necessarily conclude that the District Court did not err in granting summary judgment to Marmon on the basis of quasi-judicial immunity.  Trost argues that the District Court erred in finding that Marmon was an employee of the Fourteenth Judicial District Youth Court, rather than the four counties which comprise that district, and Defendants respond that the District Court's finding was correct.  However, because we conclude that Marmon's actions were immunized, we need not address the issue further.

***Issue 2:  Did the District Court err in granting summary judgment to Sheriff Steve Riveland and Wheatland County on the basis that neither owed a duty to Eklund?***

¶31     The District Court granted summary judgment in favor of Sheriff Steve Riveland and Wheatland County based on its conclusion that neither owed a duty to Eklund, ruling that neither Riveland nor Wheatland County owed a duty to Eklund because (1) the public duty doctrine applied, and (2) because neither Eklund's nor Trost's actions were foreseeable as a matter of law.  Eklund argues that § 61-8-107, MCA (2003), constitutes an exception to the public duty doctrine because it creates a special relationship between the officers in pursuit of Trost and himself, and that as a result, Riveland and Wheatland County owed Eklund a specific duty of care.  Further, Eklund argues that both his injuries and Trost's actions were foreseeable as a matter of law.

¶32     "A negligence cause of action entails four elements—duty, a breach of that duty, causation and damages."  *Massee v. Thompson*, 2004 MT 121, ¶ 41, 321 Mont. 210, ¶ 41, 90 P.3d 394, ¶ 41.  While all four elements are necessary to sustain a cause of action for negligence, the case before us centers upon the requirement of a legal duty.  *See Nelson v. Driscoll*, 1999 MT

11

193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21. Accordingly, we begin by noting that "[t]he existence of a legal duty can be determined as a matter of law." *Lopez v. Great Falls Pre-Release Services*, 1999 MT 199, ¶ 31, 295 Mont. 416, ¶ 31, 986 P.2d 1081, ¶ 31; *see also Massee*, ¶ 27. Thus, we turn first to the parties' arguments regarding the public duty doctrine.

¶33    When considering negligence claims against a public entity or person, "it is necessary to consider the 'public duty doctrine.'" *Massee*, ¶ 41. The public duty doctrine provides that

> a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff.

*Massee*, ¶ 41.[2] In the context of negligence claims against law enforcement officers, the public duty doctrine "expresses the policy that a police officer's duty to protect and preserve the peace is owed to the public at large and not to individual members of the public." *Nelson*, ¶ 21.

¶34    While the public duty doctrine generally shields law enforcement officers from claims of negligence, it nevertheless includes an important exception. As stated in *Nelson,* in the context of law enforcement officers, the exception arises when

> there exists a special relationship between [a] police officer and an individual giving rise to [a] special duty that is more particular than the duty owed to the public at large.

*Nelson*, ¶ 22; *see also Phillips v. City of Billings*, 233 Mont. 249, 253, 758 P.2d 772, 775 (1988). A special relationship generally arises in one of four circumstances:

> (1) by statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent

---

[2]As stated by the Utah Supreme Court in a case on which we have previously relied for this issue, "[t]he public duty doctrine provides that although a government entity owes a general duty to all members of the public, that duty does not impose a specific duty of due care on the government with respect to individuals who may be harmed by governmental action or inaction, unless there is some specific connection between the government agency and the individuals that makes it reasonable to impose a duty." *Day v. State,* 980 P.2d 1171, ¶ 12 (Utah 1999).

undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.

*Nelson*, ¶ 22 (quoting *Day,* ¶ 13).

¶35     At issue in the case before us is the first exception to the public duty doctrine—i.e., whether a statute intended to protect a specific class of persons of which plaintiff is a member created a special relationship. Specifically, Eklund argues that § 61-8-107, MCA (2003), created a special relationship between the Wheatland County Sheriff's Department and Eklund sufficient to render the public duty doctrine inapplicable. Sheriff Riveland and Wheatland County counter that § 61-8-107, MCA (2003), does not constitute an exception to the doctrine, since the statute does not protect a specific class of persons of which Eklund is a member. For the following reasons we agree with Eklund.

¶36     Section 61-8-107, MCA (2003), reads in pertinent part:

> **Police vehicles and authorized emergency vehicles.**
> . . . .
> (2) The driver of a police vehicle or authorized emergency vehicle may:
> . . .
> (b) proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
> (c) *exceed the speed limits so long as he does not endanger life or property*;
> . . . .
> (4) *The foregoing provisions shall not relieve the driver of a police vehicle or authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.*

(Emphasis added.) Evident from the statute is that while police officers and authorized emergency personnel may have authority to ignore certain laws of the road under limited circumstances, they nevertheless have a duty to drive safely under the circumstances of a pursuit.

13

Furthermore, the statute provides that drivers of law enforcement and emergency vehicles are not relieved from liability for driving in reckless disregard for the safety of others.

¶37    The case before us is strikingly similar to that of *Day v. State*, a previously cited and relied upon Utah Supreme Court case in which that court held that a statute similar to § 61-8-107, MCA (2003), created a special relationship between pursuing law enforcement officers and victims of those that they pursued. *Day*, ¶¶ 14-21. In *Day*, law enforcement officers pursued a vehicle at high speeds in and around four Utah towns, ultimately resulting in injuries to a husband and wife. *Day*, ¶¶ 3-5. Sued by the surviving wife, the State of Utah cited the public duty doctrine and argued that neither the State nor the officers owed a duty specific to the plaintiff. *Day*, ¶ 11. The court disagreed, and held that Utah Code Ann. § 41-6-14 created a special relationship under the circumstances between the pursuing officers and the plaintiff. *Day*, ¶ 14. As the court made clear,

> section 41-6-14(3)(a) . . . states that "[t]he privilege[] [of disregarding traffic laws] do[es] not relieve the operator of an authorized emergency vehicle from *the duty to operate the vehicle with regard for the safety of all persons*."

*Day*, ¶ 14 (brackets and emphasis in original). Accordingly, the court concluded that the statutes imposed upon operators of emergency vehicles a duty of care with regard to others using the streets and highways. *Day*, ¶ 14. As a result, said the court, the public duty doctrine did not apply.

¶38    "Under Montana law, it is well established that a duty may arise from a statutorily imposed obligation." *Prindel v. Ravalli County*, 2006 MT 62, ¶ 29, 331 Mont. 338, ¶ 29, 133 P.3d 165, ¶ 29. Section 61-8-107, MCA (2003), creates such a duty of care on the part of drivers of emergency vehicles. In *Stenberg v. Neel*, 188 Mont. 333, 337, 613 P.2d 1007, 1009 (1980), a police officer argued that § 61-8-107, MCA (1979), relieved drivers of emergency vehicles from

14

the duty of exercising ordinary care, and instead asserted there was some lesser duty owed by officers in emergency situations.[3] We disagreed, and held that "the driver of an authorized emergency vehicle is charged with a duty of due care under the circumstances." *Stenberg*, 188 Mont. at 338, 613 P.2d at 1010. While we went on to note that an emergency vehicle driver's duty of care included "the privileges granted by section 61-8-107(2), MCA [1979]," we nevertheless stated that a duty of care existed on the part of drivers of emergency vehicles. *Stenberg*, 188 Mont. at 338, 613 P.2d at 1010.

¶39 Though *Stenberg* did not hold that the duty imposed by § 61-8-107, MCA (1979), rendered the public duty doctrine inapplicable in that case, its analysis nevertheless supports such a conclusion. Furthermore, *Stenberg* made clear that § 61-8-107, MCA (1979), not only imposes a duty on drivers of emergency vehicles, but likewise, creates a special class of persons—those, who by use of the streets and highways are potential victims of a high speed chase—to whom the duty is owed. Our holdings demonstrate that such statutes can create special relationships between government officers and persons sufficient to render the public duty doctrine inapplicable. *See Massee*, ¶ 43 (holding that title 46, chapter six, part six, MCA, imposed a duty on police officers in favor of victims of domestic violence which, in turn, created an exception to the public duty doctrine). We thus conclude that § 61-8-107, MCA (2003), created a special relationship between the pursuing officers and Eklund, a person using the streets. As such, the public duty doctrine is inapplicable in this case.

### *Foreseeability & Duty*

¶40 The existence of a duty "turns primarily on foreseeability." *Lopez*, ¶ 27. Accordingly, "we look to whether or not the injured party was within the scope of risk created by the alleged

---

[3]The pertinent language of § 61-8-107 has remained largely unchanged since 1979.

negligence of the tortfeasor"—in other words, we ask whether the injured party was a foreseeable plaintiff. *Lopez*, ¶ 28; *see also Busta v. Columbus Hosp. Corp.*, 276 Mont. 342, 360-61, 916 P.2d 122, 133 (1996); *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99, 100 (N.Y. 1928). We note, however, that the particular accident that occurs need not be foreseen. *Ekwortzel v. Parker*, 156 Mont. 477, 483, 482 P.2d 559, 562-63 (1971).

¶41 In this case, the District Court found as a matter of law that the injury to Eklund was not foreseeable because neither Wheatland County nor its agents "[knew that] Eklund was in Harlowton at the location where the accident was going to occur." As noted above, however, foreseeability does not require that the particular accident or particular victim need have been foreseen. *Ekwortzel*, 156 Mont. at 483, 482 P.2d at 562-63. In his report, Undersheriff Christensen acknowledged that he had recognized the risks of the pursuit at the time it was occurring:

> I kept hoping that the suspects would stop, but it became apparent that they weren't. I started to slow down near the IGA grocery store. I realized that we were going way to [sic] fast in town and that someone was going to get hurt.

That "someone" turned out to be Eklund, a person using the streets and highways where the pursuit occurred, placing him within the scope of the risk and making him a foreseeable plaintiff.

¶42 Finally, it is evident that not only § 61-8-107, MCA (2003), but the police pursuits policy in effect at the time of the accident, are aimed at curbing just the sort of accident which occurred here—both embody a premise that unsafe police pursuits can and will lead to bystander injury. For that reason, we conclude that Eklund was a foreseeable plaintiff, and that a reasonably prudent officer would have foreseen that a failure to properly pursue a fleeing suspect could pose an unreasonable risk of harm to others in or near the pursuit. As such, and because

16

the public duty doctrine does not apply, we hold that Christensen owed a duty of care to Eklund under the circumstances.

### *Intervening Superseding Causes*

¶43     We next turn to the issue of causation, which also requires consideration of foreseeability.  "Although foreseeability is generally properly confined to the duty element of negligence under Montana law, where a dispute presents the issue of an intervening act of a third party, as here, we address foreseeability in the proximate cause context as well."  *Lopez*, ¶ 32.  In this case, Eklund claims negligence on the part of Riveland and Wheatland County, but was injured by the actions of Trost, and thus, as in *Lopez*, we consider the issue of intervening cause. Because the District Court decided the case based upon a lack of duty, it did not take up this issue, but we must, because the defendants argue that, even if they had a duty, summary judgment in their favor was appropriate on the issue of causation. They assert that Trost's actions were intervening superseding acts which break the chain of causation as a matter of law, and which thereby shield Riveland and Wheatland County from negligence liability.

¶44     In *Lopez*, we noted that we had repeatedly emphasized that, "in cases involving intervening superseding acts of a criminal or noncriminal nature, 'trial courts must continue to carefully review each fact situation . . . on a case-by-case basis'" because such questions normally involve questions of fact which are more properly left to the finder of fact for resolution.  *Lopez*, ¶ 34 (citations omitted).  We explained that, in analyzing foreseeability in the context of probable cause, we are concerned with "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury incurred by the plaintiff."  *Lopez*, ¶ 32.

17

¶45    Here, although we have determined that Eklund was a foreseeable plaintiff, and thus owed a duty of care, he must also establish that the defendants breached that duty, and that it was the breach which caused his injuries.   Because of the involvement of third party Trost, Eklund must establish that it was defendants' breach which "foreseeably and substantially" caused his injury.  *Lopez*, ¶ 32.  In opposition, the defendants assert that it was Trost's "refusal to respond" and his "loss of control of the vehicle" which caused the accident, and therefore, they are entitled to summary judgment.

¶46    Eklund replies, and we agree, that if we accepted the defendants' argument as a matter of law, "there could never be liability imposed on law enforcement by injuries by a high speed chase."  On the other hand, we can certainly conceive of factual scenarios wherein a speeding getaway driver could cause an injury without regard to whether pursuing police had breached their duty to pursue with care.  However, these are exactly that—factual scenarios requiring resolution by the factfinder.  Only "when reasonable minds could reach but one conclusion" may the question of foreseeability for purposes of causation be determined as a matter of law.  *Lopez*, ¶ 35 (citation omitted).  Here, whether Eklund's injuries were caused primarily by Trost or by police is an issue a jury will need to resolve.  Our review of the record leads us to the conclusion that reasonable minds might reach different conclusions as to whether Trost's actions were unforeseeable intervening superseding causes of Eklund's injuries, and therefore hold that the issue is appropriately adjudicated by a jury.  Consequently, we reverse the order of the District Court granting summary judgment to Sheriff Steve Riveland and Wheatland County, and remand this issue back to the District Court for trial on the issues of breach of duty, causation, including intervening cause, and damages.

***Issue 3:  Did the District Court abuse its discretion in bifurcating the jury trial in response to Eklund's request to introduce evidence of his settlement with Roy Trost?***

18

¶47 Immediately preceding the jury trial concerning Eklund's negligence claims against Yellowstone County and the YSC, Yellowstone County moved *in limine* to exclude evidence of Eklund's pre-trial settlement with Trost and Trost's mother, Lynne Hamilton. Eklund opposed the motion, desiring to admit such evidence to show that the $20,000 settlement had not made him whole in light of the some $80,000 in medical expenses he had incurred. Attorneys for Eklund and Yellowstone County offered spirited argument about the propriety of admitting evidence of the settlement:

> MR. TOWE [Attorney for Eklund]: [I]t seems only appropriate that if, in fact, they are going to try and say that this man is at fault, we should be able to point out that he's a young kid, doesn't have any funds of his own, and, yes, the settlement we had is a settlement that only involves his $19,000 trust fund and it's not 100-and-some-thousand dollars based on insurance. That's a real critical issue, we think it's relevant, and we think it's very, very pertinent, and we think it would be highly prejudicial if we aren't allowed to do that.
>
> THE COURT: I'm inclined to agree with [Mr. Towe], so tell me why I ought not agree with him.
>
> MR GILLEN [Attorney for Yellowstone County]: Your Honor, the issue is who is at fault here, not how much money they get. The issue is never – until the jury has decided to attribute fault can they ever go to the issue of an award of damages for that fault. By letting the jury know ahead of time that Mr. Trost has made a meager settlement in this case, I'm afraid that would prejudice the jury to think that that was the limit of the fault that he was involved with. I see it to be very prejudicial.
>
> But the fact that he settled for a pittance, arguably, is not relevant to is he at fault in this case and to what extent. I think the money clouds the issue.

In response to these arguments, the District Court ruled the evidence admissible, but bifurcated the liability and damages portions of the trial. It appears from the transcripts and colloquy above that the court bifurcated the trial in an effort to avoid any prejudicial effect of the evidence to the county.

19

¶48    In order to avoid prejudice or for court convenience, a court may bifurcate a trial. M. R. Civ. P. 42(b). "The decision whether to bifurcate claims pursuant to this rule is a matter left to the broad discretion of the district court." *Henricksen v. State*, 2004 MT 20, ¶ 29, 319 Mont. 307, ¶ 29, 84 P.3d 38, ¶ 29 (citing *Malta Public School Dist. v. 17th Jud. Dist.*, 283 Mont. 46, 50, 938 P.2d 1335, 1338 (1997)). On appeal, we review a decision to bifurcate for abuse of discretion, the test for abuse of discretion being "whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Henricksen*, ¶ 29 (citations omitted).

¶49    It is evident that the District Court had ample reason to believe that evidence of the settlement between Trost and Eklund, if heard by the jury, could improperly influence a damage award against Yellowstone County. Furthermore, it is clear that admitting evidence of the settlement during the liability phase could easily prejudice a jury in the face of the serious and apparently life changing injuries suffered by Eklund. For that reason, we hold that the District Court did not abuse its discretion when it bifurcated the jury trial into liability and damages phases.

### *Mooted Issues*

¶50    In addition to the issues discussed above, Eklund challenges evidentiary matters relating to the jury trial of the claims against Yellowstone County, including (1) the District Court's admittance of Trost's criminal convictions, (2) the District Court's decision allowing Yellowstone County to seek attribution of negligence to Trost, and (3) the constitutionality of § 27-1-703(6), MCA (2003), as applied in this case. Eklund asserts that the admitted evidence prejudiced his claims against Yellowstone County and violated his constitutional rights.

20

¶51 In its verdict of October 7, 2004, the jury found Yellowstone County was not negligent, and therefore did not reach the issue of Trost's negligence or comparatively apportion liability between Trost and Eklund. As stated by M. R. App. P. 14:

> [N]o civil cause shall be reversed upon appeal by reason of any error committed by the trial court against the appellant, where the record shows that the same result would have been attained had such trial court not committed an error or errors against the respondent.

*See also Pula v. State*, 2002 MT 9, ¶ 35, 308 Mont. 122, ¶ 35, 40 P.3d 364, ¶ 35. Further, as this Court has previously stated, "[a] matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy." *Shamrock Motors, Inc., v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, ¶ 19, 974 P.2d 1150, ¶ 19. This Court does not generally undertake review of moot issues. *Skinner v. Lewis and Clark*, 1999 MT 106, ¶ 12, 294 Mont. 310, ¶ 12, 980 P.2d 1049, ¶ 12. Here, the additional issues are moot because a controversy no longer exists. Since the jury found Yellowstone County and YSC were not negligent, it did not reach the issues of damages and apportionment of liability, and thus, the evidence of Trost's negligence was rendered superfluous. Therefore, we decline to review Eklund's evidentiary and constitutional challenges, as they are mooted.

¶52 Affirmed in part, reversed in part, and remanded for further proceedings consistent herewith.


/S/ JIM RICE

We concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JOHN WARNER

21